North American Photon v. ZoomInfo. So, Mr. Moskovitz, you're on the line. Can you hear and see me and my colleagues all right? Yes, I can, Your Honor. Good. All right. We can hear you pretty well. So with that, then, why don't we get started? You've reserved two minutes for rebuttal. So that gives you eight minutes at the gate. You may proceed. Thank you, Your Honor. And thanks for allowing me to appear remotely. I'm out here in California. So in this case, my client, Photon, filed a lawsuit against the respondent, ZoomInfo. ZoomInfo contracted to supply Photon with email contacts to potential customers. And ZoomInfo included in the data they provided some fake emails. And those fake emails caused harm to my client's marketing system. So Photon brought this suit. The trial judge held that ZoomInfo did not breach the contract by inserting those fake emails into the data supplied to Photon. Well, is it fair to say that these seed records are basically a security measure? Is that a fair characterization? That's how ZoomInfo characterized it. Well, and you would characterize them differently? Well, the problem is ZoomInfo did not inform Photon or any of its customers that it was doing this. So... Well, that might be true of a lot of security measures. But I guess I'm just trying to figure out what we're talking about here. This is a contract for records, for data. Included in that data are what you described as false emails, which are designed to help ZoomInfo figure out whether or not their data is being misused, right? Perhaps. Perhaps. The problem is by not informing their customers that they're doing this ahead of time, the insertion of the fake emails had no deterrent. So normally, that's what you would want to do, deter people by telling them there are some seed emails from your front management team who are going to catch you. They didn't do this. But isn't it both? I mean, isn't it both about, you know, deterrence and catching? I mean, those are both catching, deterring people from misusing the data and then catching them as well when they do. So, I mean, it's not a single purpose that it's being used for. And catching people who violated, who misused the data is as important or as legitimate, I guess I would say, an interest as deterring them. Well, Your Honor, there was no evidence submitted by ZoomInfo as to what the company executives actually intended. And they actually used this in negotiations for a renewal in Wheatman in order simply to get a higher price from their customers. When you say they used this, what do you mean? During negotiations, after, at the end of the year contract, when they were negotiating for a full-time learner about these fake emails, and ZoomInfo brought them up during the negotiations. So, it's entirely possible that the purpose of these fake emails was not, as you suggest, a security measure, but a bargaining chip in order to get a lower price. Now, we don't know the actual intent. But, excuse me, I'm not clear why knowing the intent exactly is entirely relevant here. I mean, there was already some provision in the EULA for 95% accuracy, not 100% accuracy, that there would be some emails that might be inaccurate for one reason or another. And given that, there was not a commitment to the 100% accuracy. And they don't have to explain why there might not be 100% accuracy, it seems to me. There was no obligation that I could see in the agreement to do otherwise. So, what am I missing? Why do we have to talk about exactly how they intended to use the seed records? Everyone seems to agree that there was a legitimate security purpose. And you're saying, well, but they should have told us about it if they really wanted to pursue that purpose. But it seems to me we're getting far from the agreement language and from your own client's obligation to cease using the records when the agreement ended. Your Honor, I don't agree with that. If you go to a store and buy a television set, you go to a car dealer to buy a new car, you get a warranty. And you know that the TV set or the car may not be perfect enough for the dealer to fix certain things. That's a far cry from the manufacturer of the TV set deliberately inserting into your TV set some type of spy feature or something that records every program you watch so that you sell it to market. They're far different. Yes. I mean, I suppose it could be. I'm sorry, Mr. Moskovich, but it seemed to me that, you know, maybe that's a tort. In other words, if a wedding chair rental company, you know, decided to make sure people aren't taking their chairs and using them in ways that they haven't contracted for, put a homing device on the chairs, and it gave them all sorts of insights as to private information, maybe that would be a tort. But I'm not sure why it's a breach of contract. So in this case, you got what you bargained for, right? You got data at a particular price. You're saying they breached the contract because they had a security system that necessarily involved including some data that was actually false. It was not a true email. It was a stealth email designed to see if you were going to use it in improper ways. Is that a fair characterization? All we're doing is following the contract. The contract was Zoom's forum contract, all right? Photon put not a single word in that contract. Zoom's contract says this contract governs the delivery of data, and the data we'll deliver is the data on the ordering form that Photon submitted. Photon submitted an ordering form that listed several types of data. It never listed steam emails, fake emails, anything like that. This is ZoomInfo's contract requirement. We're not going for general intent or anything like that. We're going for exactly their language. Their language says we are going to supply what you put on the ordering form. Photon put it on the ordering form, and ZoomInfo gave something else. They gave what was on the ordering form, and they stick something else in there. It's a clear breach of the express contract. But you got everything you asked for, right? So you got, I gather it was calculated that 259,480 records were received by Photon, and of those, 1,009 received records, which is 0.39% of all the records. So wasn't that very substantial performance? And this security measure taken by the seed records, it doesn't seem to me to conflict with the contractual obligation that ZoomInfo had to you under its accuracy provisions. Look, this comes up on summary judgment. Photon CEO put in a declaration explaining how harmful this was. What Photon does is they try to get new clients and new sales by this system, this very sophisticated marketing system that has at its base accurate emails. What ZoomInfo's fake seeds did was override and replace some of Photon's accurate contact information. They're lost forever, all right? And this doesn't go to trial. If we go to trial and a jury finds that this was not harmful, we lose. Fine. But you can't decide something like this on summary judgment. This is, according to the CEO of Photon, a real harm to the company if they hadn't anticipated it. It's not in the contract that ZoomInfo wrote. And if ZoomInfo had told Photon about it ahead of time, fine. If the CEO says, if they had told us, we wouldn't do business with them. Can't risk that kind of harm to our marketing system. If I could ask just a brief question. If we were to disagree with you on that and find that the district court was correct in granting summary judgment, I was concerned about the gap period that the district court found you did not need to compensate Zoom information for, which was between July 2019 and August. If I have this right, just a second. There was a period in which you began using the information again, but that hadn't been shown by the use of the seed records. But it looked like you had retained the information in the meantime. That there was a six-month period where the district court awarded no damages. But it seemed to me that you, it seemed pretty clear that you would retain the information. You're claiming you retained the information during that period and hadn't demonstrated that you had destroyed or otherwise deleted the information. I'm sorry, I'm a little imprecise about the dates here. But do you understand my issue? District court, yeah. I'm not sure I see it either as you. And then, according to the declaration of POTON CEO, here's what happened. POTON itself was not using any of that material after the expiration of the contract. What happened was a rogue employee of POTON left the company, took all of this data with them, and they started using it. And POTON didn't become aware of it until June 12, after the contract expired, during the negotiations, and said, hey, we got these big emails, somebody sent them to us, and you're the only one that has it. And all of a sudden, POTON realized what happened. They tried to get rid of all the data at that point, find out who did it, and censored it. But isn't POTON responsible for the rogue employee, not Zoom? I mean, that still resulted in the misuse of their information during this period, and the retention of the information. Well, I want to get back to this contract that Zoom info wrote, one contract, that expressly provides that if there's unauthorized use of the material, which is exactly what happened, POTON should use commercially reasonable best efforts to put a stop to it. And that's exactly what they did. They immediately tried to get rid of this material, find the guy who did it, and get him to stop doing it. That's true, but POTON had a separate obligation to destroy these materials, right? How can you destroy the materials if you don't know they're out there with somebody else, and Zoom info doesn't tell you until after the contract expires? How can you do that? You can't destroy something in somebody else's hands if you don't know about it. Well, you're saying that the record reflects that POTON complied with the contract, destroyed what it had, and then later found that the rogue had made off with some portion of it, but that POTON had otherwise destroyed the materials? Well, they destroyed what they had, but they didn't know this employee had virtually everything. So it's off the premises. It's out on their side. They didn't know. So as soon as they found out, they tried to get rid of it. But what the trial judge did said that section 6.4 on commercially reasonable best efforts doesn't even apply. It's strict liability. You've got to delete all this 30 days before the contract expires, even if you don't know somebody else is taking it. What they did, what the court did, was read 6.4 out of the contract, out of Zoom info's contract. All right. If there's any doubt about what I just said about what that contract means, it's resolved against Zoom info. This is their form. Okay. Well, we're a little bit over, but you still reserved two minutes for rebuttal. We'll now hear from Mr. Warshavsky. I'm used to seeing appellees over there, but I guess it doesn't matter. Yeah, my apologies. Warren Warshavsky of Baker Hostetler for Zoom info. I want to start by correcting a few things that my colleague said. A lot of what he said actually isn't in the record. I want to talk about what the contract is and what it says, just for a moment. Well, actually, could you just start where he ended? Yeah. And so, I mean, the contract requires Photon to destroy or otherwise- Correct. Return data that it's got after the termination of the contract. Correct. Is the only use that took place after the contract term ended used by the rogue employee, or is there retention by Photon separate from the rogue employee? Well, Photon's testimony at trial, which is a little different, was that it was on their system and they continued to try to delete it. They had a very different story that, oh, the seed records just kept popping up. This rogue employee, nobody ever said the rogue employee left the country. And actually, the undisputed evidence below was that there were four employees at the end of the contract, during the renegotiation period in May 2018, working around the clock downloading. So much so that it triggered a different security to shut it off. Photon complained, said, hey, our access is shut off, and then got back on and started downloading. So it was four employees. There was no evidence whatsoever of destruction. No one ever identified this rogue employee. No one ever identified any efforts. This is an attorney argument, but there's no evidence in the record about that. And I think, going back to the contract itself, Mr. Moskowitz and Photon keep reading terms into the contract. And in our brief, we cite the Phillies case, the Phillies v. Greenfield, it's the Ronnie Spector case, where the Court of Appeals of New York was very clear. Even if it's custom and practice, even if it's commercially reasonable, if a term isn't in a contract, a party can't read it in. Here, I would argue, the contract, I think, a few times in your questions, was very, it shows you understand it. It's very clear. There's a 95% accuracy threshold. And I'd also challenge the numbers. While Photon's attorney argument is 250,000 downloads and 1,000 false records, the actual evidence showed it was 45 million downloads and 537 false records, or seed records. Way within the thresholds. I'd also like to talk about what ZoomInfo provides under the contract. And ZoomInfo is a database. It's kind of like Westlaw or Lexis, right, which we all know. But we log on, we can do searches. If we want to, we can download, but we don't have to. What ZoomInfo really sells is access to data. How you use it is up to you. And if you look at some of the materials in the file, there are plenty of users who never download a record. So downloading is a separate piece to this, right? Why is that important? Because what really, I think the way Photon has treated this is somehow by- Can I just interrupt? So you're saying it's access to a database that is continually updated and changed and modified over time and that downloading is a separate action. Correct. But it also gets access to the option to download. Correct. Just like Westlaw or Lexis. If you look at me, I download every case and I print it out. If you look at my younger colleagues who are here, they do their research without a download, without a printout. Anybody can use it how they want. There's functionality added to that for people who work in a cyber realm. It's much easier for them to shoot information to the cell phone and have access to it, right? Much like a decision right now. People may not download it. They might just go to ECF to read it. The reason that's important is that it's not a provision to- The contract doesn't allow a user to just own the data. The reason that provision about destruction is in is that that data belongs to ZoomInfo. And so that's where I go back to the contract and what we see as the problems with the damages trial is that ultimately throughout that time period, throughout the period through at least August of 2020, it's not disputed that Photon had access to these records. Photon continued to use the records. And by the way, if you look at what was sent out, what ZoomInfo caught, it wasn't a rogue employee. It was Photon branded email, right? So well- So in terms of destruction, that means you have to demonstrate at the end of your contract that you have or you have to swear that you have deleted all downloads that you've made. Something like that, is that what would satisfy the contract? Well, I think in this case it would. I think normally people are expected to behave the right way and just destroy. We're talking about the download. Right, but delete the downloads from your computer. Right. That's all. I don't think you have to wipe the system. You just have to show that you've- And when they challenged when Photon brought the suit, certainly it should have shown, here's how we deleted. Here's how we tried. Here's a rogue employee. All we have on that is unverified and it contradicts Photon's own evidence. And so I think at that point we can move on to what Photon, you know. I think we know what Photon did, what it didn't do. It didn't- So you're moving to damages now? Is that where you're headed? I was going to go to that. I could go back to the contract. I don't know that there's much to add to what my adversary said. I heard you ask him. He hasn't pointed to a provision of the contract, right? And then he says, well, the contract says we're beat reasonable commercial efforts. He's read that in, right? The district court said he's read it in. You can look at the contract. That's not in there. Well, but look, if instead of the seed info, which has been characterized, I guess, by us as a security measure. What if ZoomInfo included malware? Would that be a breach of contract, or would that be just a tort that falls outside of the contract? It would seem to me that would be a tort, Your Honor, because it's something which would sit alongside the contract. I'd have to think about that. In this contract, I don't think it's covered. You would certainly argue, if you were Photon, that they would deprive the benefit. Like if it didn't allow for Photon to use the records, for example, you would say it cuts to the consideration it thought it was getting. If ZoomInfo was somehow trying to harm somebody using the database as a front, let's say, to attack computers. I think it's fraud. I think the contract is probably part of the fraud, not a separate tort. I'm not sure if I've answered your question. You don't look satisfied by my answer. I'm not sure you have answered it, but I mean, it's not this case. I'm just trying to figure it out. I mean, you're saying they got what they bargained for. Correct. And what they're calling sort of has fallen outside of what's required under the contract is really just a security measure that you guys take to make sure your things are not being, that your property is not being misused. Correct. Correct. And there's evidence about how that's generated, and that's only for download. So when someone accesses the database, there's no seed records. The evidence shows that seed record actually is generated in addition. So let's say you were downloading 100 records, 101st gets popped in. It's something totally contrived, but if there's a mass market email that gets sent out, that will be included. It's a way for ZoomInfo to monitor. I mean, you do want to get to damages, and I wanted to ask about damages, too. So I guess I'm trying to figure out the district court sort of didn't award damages for a period where there were no downloads, but there was still possession of the data. Right, and that's one of your principal arguments. Correct. How do you monetize that? So what were your damages for the continued possession of the data? It's a subscription price. As long as Photon has access to it, it doesn't have to pay to use a database. But is there any indication that they were using the database? Well, they had access to it. They don't have to use it in the contract period. What we have is the seed records, which certainly shows from time to time, they were continuing to use it. So I guess the contract provides that after the termination date, or even before, I think, you have to basically not use the data in certain ways, and then ultimately you have to destroy it, right? Correct. So if you don't destroy it, but you don't use it, you're just negligent. You don't get around to destroying it. Your view is that the damage is the subscription price as though you had renegotiated the contract. It's not a renegotiation, Your Honor. You owe all the damage. Yes, that's exactly what it would be. It's kind of like if I stay in a hotel room overnight, I keep a rental car an extra day, I get charged the rate, right? I don't get to say, well, because the hotel didn't know I overstayed, they didn't clean the room for me. Or because I overstayed a day in my car, I didn't get serious XM for the extra day or the NAV system, right? Ultimately, there's a negotiated price. It's well established, and the price is for access to the data. And what about the finding in the district court that most people didn't pay sticker price, that there were less than one year subscriptions, I mean, what do we make of that? Well, the less than one years, and those are two different questions, if I could answer those in order first. The first one is people don't pay the sticker, and that's right. But, and there was testimony because the district court asked about it, so we provided it. We would argue that Photon, after the theft, after keeping it, should it get the value of a negotiation? There is a list price, it's in the original contract, Photon knows that. It shouldn't be able to stay past its date and then say, we want the benefit of a discount, right? It's kind of like me staying in the hotel room. I can't say, well, the credit card offered me a deal, I want to cut that now, right? The time to negotiate is when you're entering into the contract, not after you've breached. And your honor, I'm sorry, I forgot the second question now. Well, I think the answer is probably the same, is that there were less than one year subscription. The one, well, that's right, but this was a renewal term, it was going through it, and the discussion between the parties were the renewal terms, and in the promotional materials, it does allow for monthly subscriptions, however, the witness who testified said that when they renegotiate, they renegotiate for one year period. And the district court just focused on use as opposed to continued possession and access? Correct. That was brought to the district court's attention? That's right. Well, the district court also was looking at what's the value of the data. I think that was very, if you look at the end of the summary judgment, they said, well, the district court said, he has to consider what's the value of the data. And that's where we think it took a different turn. We still tried to argue, well, the value is the list price and what you would get if you were a customer off the street. Not the benefit, we weren't seeking consequential damages. If you look at what Photon says, the bad data cost. I know you have to take a little bit of a leap here, but if Photon's saying, well, these thousand records costed millions of dollars, that means the value to Photon was significantly greater. We're looking at it as this was, Photon was supposed to keep it in its possession. I know I'm past my time, if I could raise one other point about the breach, which didn't get caught, which is Photon also gave it to third party package. Whether it was giving package its login, or whether it was downloading data and giving it to package. Point was, Photon was breaching throughout. And one other place where I would correct Mr. Moskowitz, and I think the record bears it out. ZoomInfo didn't use this to negotiate. ZoomInfo actually was renegotiating. Talking about the evidence shows that ZoomInfo actually brought it up after doing the negotiations saying, by the way, guys stop, you're still using the data, and still kept negotiating on a discounted rate. It was Photon that chose to sue when ZoomInfo said, hey, you're still using, you're still using. Photon then brought the suit. ZoomInfo wasn't using this as a cudgel to force a renegotiation. Thank you very much. Mr. Wachowski will now hear from Mr. Moskowitz for two minutes of rebuttal. I want to remind the court that the usual liability is decided on summary judgment. Opposing counsel is trying the case in front of this court. They're saying our evidence is wrong because it's disputed by their evidence. And not only that, he brings up evidence at the damages trial, which wasn't even about blackmail. This is summary judgment. What he should be focusing on, which he didn't mention at all, is Photon's evidence from the CEO. And the CEO's declaration on this is very short. But he says on an unknown and certain terms that this whole thing happened because a rogue in court, who apparently, after he left, went to a company called Hackett, which opposing counsel doesn't even link somehow to Photon. But the CEO does. He says, this guy left the company and then started using these emails. As soon as we found out at the end of the contract renegotiation when ZoomInfo finally told us, we tried to put a stop to it. That comes squarely within section 6.4 of ZoomInfo's form contract. They took commercially reasonable efforts to put a stop to it. A reasonable jury could find that. It's not up to this court, not up to the district court, to resolve this factual dispute. This is summary judgment. And the CEO's declaration raises a tributial of that. That's what summary judgment is about. We shouldn't be trying for the case in front of you, in front of this court. That's not what you're for. And- Well, contract construction is generally a matter of law. And so I guess I'm not sure what you're saying. What is the disputed issue of fact as to whether or not section 6.4 applies to basically a breach of section 7.2? You're absolutely right. It's a matter of law. It's a matter of conviction. And I invite the court to look at these two sections, 6.4 and 7.2, and try to reconcile them. And to me, the only way to reconcile them, to give effect to both, is to apply 6.4 to this situation, which is exactly what the CEO says in his declaration. There was unauthorized use here. By this rogue employee. We have to use commercially reasonable best efforts to stop it, and we tried to do it. And we tried to do it several times. There was a glitch because Photon uses Salesforce. This is in the declaration. And for reasons we can't explain, Salesforce keeps reloading these seed emails after Photon leaves them. Maybe that'll be fleshed out at trial, if this court allows it at trial. But this is the sort of thing that has to be done at trial to be done properly. It can't be just opposing counsel for Zoom Info getting up and saying, hey, here's what happened. Here's what really happened. No. What really happened depends on the evidence that Photon submits opposition to the motion for summary judgment. That's the way it's done. And the CEO's declaration does that. That's all we should be looking for. Not all this stuff that happened at the damages trial. This other stuff that counsel comes up with. That's not what Zoom does this for. Okay, so thank you, Mr. Moskovitz. I think that you've gone a little over, but we've been letting people go a little over this morning. Because we did have questions. But we will reserve decision on this appeal. Thank you both, and thank you for getting up early, Mr. Moskovitz. Have a good day.